# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>    Plaintiff,<br><br>vs.<br><br>LI CHEN (2),<br>    Defendant. | CASE NO. 2:19-cr-163(2)<br><br>JUDGE SARAH D. MORRISON<br>MAGISTRATE JUDGE KIMBERLY A. JOLSON |

## UNITED STATES' MEMORANDUM IN OPPOSITION TO DEFENDANT LI CHEN'S MOTION TO REVOKE DETENTION ORDER

The United States respectfully submits this memorandum in opposition to defendant Li Chen's motion to revoke detention order (ECF No. 84), and her supplemental filing in support of that motion (ECF No. 86).

Chen's motion should be denied. The situation for Chen is the same now as the last detention hearing she had in front of Judge Jolson, and the circumstances here mirror those before the Court when Zhou appealed—and lost—as to that decision: Chen remains an incurable risk of flight. In her motion, Chen doesn't contest that this is wrong. Instead, she argues that she should be released from custody on two interrelated grounds: the COVID-19 outbreak and her understanding of the United States Attorney's response to the outbreak. Because the argument is premised on a misunderstanding of the United States Attorney's policies on detention, and because the COVID-19 outbreak does not at present alter the Court's finding by a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required, the motion should be denied.

## I. BACKGROUND

Following her indictment on trade-secret and fraud charges, Defendant Li Chen and her husband Yu Zhou appeared before Magistrate Judge Jolson for a detention hearing. In the hearing, held September 16, 2019, the United States proffered evidence that Chen had the motive, means, and opportunity to flee, and that if she fled to China, she could not return to the United States through the extradition process. Magistrate Judge Jolson found the defendant to be a flight risk, and ordered her detained pending trial. More particularly, Magistrate Judge Jolson concluded that the United States had proven by a preponderance of evidence that no conditions could reasonably assure her appearance in court. (ECF No. 29 at 2; *see* 18 U.S.C. § 3142(e)(1).) Magistrate Judge Jolson came to this determination, in part, due to:

- The fact that Chen would be "[s]ubject to lengthy period of incarceration if convicted,"
- Chen's "[l]ack of significant community or family ties to this district,"
- Chen's "[s]ignificant family or other ties outside the United States,"
- The fact that Chen "has substantial business and familial ties to China and has travelled to China frequently,"
- The fact that Chen "has resources to flee," and
- Finally, the fact that "little was presented to the Court to demonstrate ties to the District or the United States." (*Id.* at 2–3.)

The Court made similar findings in ordering Zhou detained. (ECF No. 31.)

Zhou then appealed Judge Jolson's Order to this Court. After thorough briefing (ECF Nos. 47, 51), as well as a hearing on the matter, this Court issued a detailed opinion concluding that Zhou remained a flight risk and that he would therefore be detained pending trial. (*See* ECF No. 58.) The Court reached this conclusion after a thorough review of Zhou's history of deceptive

conduct, business connections in China, family connections in China, connections to the PRC Government, and substantial means and incentive to flee. (*See id.* at 8–12.)

## II. ARGUMENT

The same is true today as it was when Chen was ordered detained in September: She remains an incurable risk of flight. Judge Jolson was correct when she ordered Chen and Zhou detained in September, as was this Court when it ordered Zhou detained in November. Chen does not allege that any circumstances have changed that decrease her risk of flight, but instead uses the COVID-19 outbreak as a reason for release. Given the substantial precautions taken by the Delaware County Jail, as well as the segregated nature of Chen's confinement, the argument falls short. For these reasons, the government urges the Court to decide this motion on the filings, without an oral hearing. Beyond the merits strongly favoring detention, the current climate associated with COVID-19 presents an additional compelling reason not to have a hearing.[1]

### A. Chen Presents an Incurable Risk of Flight.

Although Chen did not initially challenge her order of detention, Zhou did, and much of the Court's analysis denying Zhou's bond motion applies to Chen. Further backing this up, the evidence presented at Chen's original detention hearing confirms the Court's analysis with respect to Zhou, and provides even more support for the government's position that there is no principled reason to justify treating Chen any differently. It remains the case that the factors under 18 U.S.C. § 3142(g) strongly support detention.

---

[1] *See* General Order No. 20-05, available at https://www.ohsd.uscourts.gov/sites/ohsd/files//20-05%20General%20Order%20In%20Re%20Court%20Operations%20Under%20the%20Exigent%20Circumstances%20Created%20by%20COVID-19%20%202020.03.20.pdf ("In re: Court Operations Under the Exigent Circumstances Created by COVID-19").

*Just as the Court explained with respect Zhou, the nature and circumstances of the allegations "support detention in this case."* (ECF No. 58 at 9.) Chen worked in tandem with Zhou every step of the way during the fraud scheme—including at Nationwide Children's Hospital (NCH), including when it came to applications to the PRC Government, and including as a paid expert on behalf of the PRC Government. (*See* ECF No. 23 at 2–7.) It is still the case that "the actions of [both] Zhou and Chen have resulted in millions of dollars of losses," and it is still the case that "[e]ach defendant is a principal player in the scheme to steal trade secrets and to sell them for personal gain." (ECF No. 58 at 9.) Chen, moreover, faces the same penalties the Court concluded were at play in the analysis of whether Zhou should be detained. (*See id.*) As to this last point: having faced some time in confinement already, and knowing that her chances of success at trial are not high, her incentive to flee is greater now than it has ever been. In short, the government agrees with the Court: "The charges are serious," and they justify detention. (*Id.*)

*The weight of evidence in support of detention is as strong for Chen as it was for Zhou.* Like Zhou, Chen, too, has access to a significant amount of cash. (*See* ECF No. 58 at 10 (citing Chen's Sept. 16, 2019 Detention Hearing Tr. at 22).) While she did not travel to China as much as Zhou, her travel remains a concern for the government. At the time of her initial apprehension, Chen had traveled to China six times in the past year, with the most recent trip in July of 2019, which was the month she was apprehended. (*See, e.g.*, Chen's Sept. 16, 2019 Detention Hearing Tr. at 20; Chen's Sept. 16, 2019 Detention Hearing, Ex. 11.) Part of this travel included a trip at the end of 2018 that lasted a month. (*Id.*)

Chen's trips to China further underscore the strength of her connections there, which gives the government great pause about the possibility of her release. At the time of her arrest, Chen

4

stated that her parents and brother still live in China. As the hearings, filings, and exhibits to date have made clear, Chen has substantial, and deep, ties to China and the PRC Government—from her touchpoints with PRC Government programs, to her family, to viable business ties in China, to Chinese bank accounts. (*See, e.g.*, Chen's Sept. 16, 2019 Detention Hearing Tr. at 22–23; Chen's Sept. 16, 2019 Detention Hearing, Exs. 4 (poster presentation with scientific collaborators in China), 7 & 8 (connections to PRC-affiliated ITTN), and 9 (signed payments from SAFEA); Zhou's Nov. 19, 2019 Detention Hearing, Exs. 14 (business incubation report showing assets of Chen's Chinese company as of 2015), 15 (2016 balance sheet showing viable income stream in China from Chinse company), and 16 (reimbursement request from PRC-affiliated talent plan, listing Chinese bank account affiliated with Chen).)

*This Court previously held that Zhou's history and characteristics "weigh[] heavily in favor of detention," and the same is true for Chen.* (ECF No. 58 at 12.) Chen has given the Court no shortage of examples to cite in making the same finding here.

She has an extensive history of deceptive conduct, which the government has described at length in its prior filings. (*See, e.g.*, ECF No. 23 at 2–7; No. 58 at 2–5, 7–11.) In ordering Zhou detained, this Court summarized some of that conduct. (ECF No. 58 at 10–11.) Chen's conduct is no less deceptive. In broad strokes, Chen was a trusted employee, and the lead researcher for one of the Hospital's premier research labs, for a decade. She is alleged to have exploited this trust by engaging in a years-long theft scheme to steal sensitive Hospital trade secrets and property regarding research conducted in furtherance of the treatment of vulnerable children. The theft scheme involved extensive allegations of deceptive conduct, including Chen failing to disclose outside exosome-isolation companies she started, or supported, in both China and the United States

5

focused on precisely the same subject areas as her research at NCH. (*See, e.g.*, ECF No. 23 at 2–7; No. 58 at 2–5, 7–11.)

Deepening the extent of Chen's history of deceptiveness, she has a host of ties to PRC Government institutions and programs. The government has cited some of those ties in prior filings. (*See, e.g.*, ECF No. 23, at 8, 12, 14–15.) For the sake of the present, it suffices to say that multiple PRC Government institutions and programs paid her regarding research she was doing at the Hospital.

Finally, at the time of her arrest, Chen agreed to sit for a five-hour interview with law enforcement, during which she made repeated misrepresentations. The subjects of her misrepresentations spanned her work at NCH, her knowledge of and connections to PRC Government institutions and programs, and her business activities in China. Chen's multiple knowing misrepresentations to law enforcement are consistent with her pattern of deception, further indicate that she wants to hide her overseas connections, and confirm that she cannot be trusted on pretrial release.

*Chen remains an incurable risk of flight*. If Chen flees, she will not come back. All it would take would be for Chen to get to a Chinese consulate, and there would be no way to compel her return given that the United States has no extradition treaty with China. As the government has explained in prior briefings, these concerns are not theoretical, which further underscores the need for Chen's continued detention. (*See, e.g.*, ECF No. 51 at 14 (citing cases, including a trade secret theft case where the defendant fled to China after release).)

### B. Chen's Motion Does Not Change the Fact that She Remains an Incurable Risk of Flight.

#### 1. At Present, Officials Have Established Comprehensive Health Measures at the Delaware County Jail to Avoid a COVID-19 Outbreak.

Chen does not challenge any of these findings. Instead she points to the COVID-19 outbreak and attaches a March 16, 2020 email from the Federal Public Defender for the Southern District of Ohio that represents that United States Attorney DeVillers has instructed Assistant United States Attorneys in this District "not to seek detention solely on flight risk." (Exhibit to Defendant's Motion, ECF No. 84-1 at 1.) This email misrepresents the United States Attorney's policies on detention during the COVID-19 outbreak. There is no categorical rule not to seek detention based on risk of flight. Instead, the United States Attorney has communicated to AUSAs that they should continue to seek detention based on flight risk in extraordinary circumstances, such as where the defendants are foreign citizens or where extradition in the event of flight would not be possible. This directive is not a new policy. Instead, it is a temporary measure intended to address the ongoing national health crisis. This limited directive does not create a right of release, nor does it help Chen in this case.

In light of this proper understanding of the United States Attorney's temporary instructions on detention, that leaves Chen's argument that her "physical or mental condition" justifies release. Chen contends that the COVID-19 outbreak presents "significant new and material information" regarding the defendant's health that was not available at the time of the detention hearing before Magistrate Judge Jolson. (ECF No. 84 at 6.) The contention lacks merit.

For starters, Chen misstates the standard. Although she argues that Section 3142(g)(3)(A) directs the Court to consider the defendant's "physical health," (*id.*) that phrase does not appear in the statute. Instead, it directs the Court to consider the defendant's "physical and mental

condition." 18 U.S.C. § 3142(g)(3)(A). When viewed under the proper textual standard, it is clear that COVID-19 does not change the detention analysis for Chen. She has not been diagnosed with COVID-19, nor is she exhibiting symptoms of the virus. According to the Pretrial Services officer in California, Chen reported that "she is in good physical health with no medical problems reported." The officer verified that information with Chen's spouse. The United States has not learned, and Chen's motion does not reveal, that she has developed any physical condition since the preparation of that report.

This leaves Chen's motion relying on the specter of infection within the Delaware County Jail, where she is detained. The argument first falls short because she presents no case law suggesting that a possible future physical condition, not yet manifested, is a valid reason for release. Even if it were, this would be a poor case for release.

The Delaware County Jail is taking substantial precautions to protect all inmates, and the conditions of Chen's confinement make her particularly unlikely to be exposed to COVID-19. On March 19, 2020, the United States spoke with Jessie Jackson, the Assistant Director of the Delaware County Jail. (The following description of the Jail's policies and conditions are based on this conversation; given rapid developments around COVID-19, some circumstances may change.) She explained that the Jail has no confirmed cases and no suspected cases of COVID-19. She also explained the precautions the Jail is taking to prevent COVID-19 transmission. Broadly speaking, the Delaware County Jail has reviewed the directives and recommendations of the Centers for Disease Control and Prevention (CDC), the Ohio Department of Health, the Delaware County Department of Health, the Ohio Department of Rehabilitation and Correction Bureau of Adult Detention, and the Governor's Office. According to Assistant Director Jackson,

the Jail is strictly following and implementing all of the directives and recommendations. The following summarizes some of what the Jail is doing to keep inmates and the public safe.

*New inmates.* In response to the COVID-19 outbreak, the Delaware County Jail has adopted additional screening procedures for new inmates. Before entering the building, all inmates undergo screening by medical professionals in the Jail's sally port. The new inmates have their temperature taken and complete a screening recommended by the CDC. The medical professionals also take the temperature of any arresting officer. Any inmate or arresting officer who has a measured temperature of 100.4° F or greater is not admitted to the Jail. New inmates then undergo a full intake process, which includes measuring vital signs such as blood pressure and, again, temperature. Furthermore, when a new inmate arrives, Jail personnel engage in a classification procedure, which determines the inmate's assigned classification level—for example, minimum security, medium security, or maximum security. The classification process takes approximately 72 hours, during which the new inmate is not in contact with the Jail's general population. If the new inmate shows symptoms of COVID-19 during the classification process, she will not be introduced to the general population.

*Visitation.* On March 13, 2020, the Delaware County Jail temporarily suspended all on-site visitations, to reduce the risk that COVID-19 will be introduced to the Jail. Defense attorneys may visit their clients, but during the suspension of on-site visitation, visits with counsel now occur in a booth, separated by glass. Ordinarily each inmate is permitted one on-site visit per week. Because inmates cannot have on-site visitation at this time, each inmate receives one free off-site video visitation per week, which allows her to connect to family and friends on a computer or smartphone app. The Jail has also ceased on-site programming for inmates.

The Delaware County Jail has reduced how many Jail and County employees have access to the building. Jail management has juggled work schedules to reduce the total number of people entering the Jail. The Jail has developed emergency staffing plans (not yet in place) that would require employees to work fewer, longer shifts, to decrease the number of officers and employees entering the Jail. Every person who enters the Jail—officers, staff, county employees, medical staff, kitchen staff, even the county sheriff himself—has her temperature taken before entering the building. As with inmates, any person whose measured temperature meets or exceeds 100.4° F cannot come in. All people who enter the Jail also complete a CDC-recommended screening. For employees and contractors, this occurs every time they report for duty; for example, a person working five shifts per week has his temperature taken at least five times and completes the screening five times. Anyone with a temperature of at least 100.4° F is sent home, and anyone with known exposure to a confirmed case of COVID-19 cannot report for duty for 14 days.

Relatedly, the Delaware County Jail has worked with state court staff to allow for court appearances to be conducted by video. Currently no inmates are being transported to the Delaware County Court of Common Pleas or the Delaware Municipal Court for court proceedings. This prevents movement of individuals in and out of the Jail, with the goal of preventing COVID-19 exposure.

*Inmate/detainee education.* In response to the COVID-19 outbreak, the Delaware County Jail has provided mandatory education to all inmates and detainees. The Jail has kiosks mounted on the wall that provide various information. This now includes information provided by the CDC and the Jail's internal medical provider regarding healthy habits, sanitation, and hygiene. This

education is mandatory, meaning inmates cannot purchase items from commissary or have visitations until they read it.

*Cleaning and hygiene.* The Delaware County Jail has undertaken substantial additional cleaning and hygiene precautions. Most importantly, officers conduct additional *hourly* cleaning of inmate living areas during waking hours. Jail staff uses disinfectant solution to clean all touchable surfaces every hour. Officers—not inmates—are performing the extra cleaning, and all officers have received specific instructions about how and where to clean. That means every touchable surface in every inmate's living space is cleaned every hour.

Inmates also have access to hygiene products. Restrooms are supplied with soap, and the Jail provides additional hygiene items to indigent inmates. Inmates may shower as often as they like, except during periods of lockdown and during overnight sleeping hours. Additionally, inmates have access to disinfectant solution if they choose to conduct cleaning above and beyond the scheduled cleanings.

*History and preparation for outbreak.* As with all correctional facilities of a certain age, the Delaware County Jail has experience protecting against disease transmission and outbreak. During the recent outbreaks of SARS, Ebola, H1N1, and avian flu, the Jail employed additional screenings and precautions. The Jail had no confirmed cases. The precautions the Jail is taking for COVID-19 exceed those the Jail took for these other recent outbreaks. Jail staff are accustomed to controlling more common viral diseases, such as seasonal flu, and has established procedures of isolation and medical monitoring. Although the Jail has had confirmed cases of seasonal flu and other more common diseases, it has had no major viral outbreaks. For COVID-19, the Jail has

adopted quarantine procedures, set in place by the Jail's health director. It has set aside cells for possible quarantine if necessary.

*Reduction in population*. Roughly one week before the United States' March 19 conversation with the Assistant Jail Director, the population of the Delaware County Jail totaled roughly 220 inmates and detainees. On March 19, 2020, the population was approximately 150. The Delaware County Prosecutor's Office and the courts in Delaware County have reviewed the custodial status of inmates, and the courts have released several inmates in an effort to reduce the jail population. Jail staff has worked with courts, all levels of probation, law enforcement, and the county prosecutor's office to balance the need to reduce the jail population with the need to protect the public and prevent flight from prosecution.

In addition to the substantial steps the Jail is taking, Chen's conditions of confinement also make her particularly unlikely to be infected with COVID-19. Due to concerns about Chen's ability to assist counsel in her defense while detained, the United States collaborated with the Delaware County Jail to ensure she would be able to review electronically stored information provided in discovery. In February, the FBI provided Chen's counsel a laptop that would allow her to review discovery materials. The Delaware County Jail moved Chen from a larger, dormitory-style room with capacity for 24 bunks. She now resides in a more isolated living space. Chen has a single cell with a toilet and sink, and a door that can be closed by officers or by Chen. The door connects to a day room with a phone and a television. The day room, in turn, connects to another single cell, where another inmate resides. Chen and the other inmate take their meals in their cells or in the day room—not with other inmates. Although Chen may voluntarily choose to take outside recreation where she could interact with other inmates, there are presently no

circumstances where she would be required to be in contact with inmates other than the one with whom she shares the day room. The Delaware County Jail does not expect her to be around a newly booked inmate in her living area for any reason. In short, she has a private cell with a door she can close, and regular contact with only one other inmate.

Chen's citations to other Districts' views of the speculative nature of the harm do not change what is before the Court now: the Delaware County Jail has taken extraordinary measures to get in front of any risks that might be presented by COVID-19; the Jail has no current cases, or even indication of potential cases; and the risk of infection for Chen is low at present. These circumstances do not justify release. *See United States v. Temponaras*, No. 20-3192, Slip. Op. at 2 (6th Cir. Mar. 17, 2020) (concluding that "the coronavirus pandemic," among other circumstances, did not rise to "an exceptional circumstance" that would justify a post-conviction release on bond). She should remain detained.

**2. The Proposed Conditions Do Not Temper the Risk of Chen's Incurable Flight.**

In her first filing in support of her motion, Chen asks to be released subject to the conditions proposed by the Pretrial Services report issued in the Southern District of California from July of 2019. (ECF No. 84 at 7.) In her supplemental filing, she states she "is agreeable" to a requirement that she live at an approved residence under house arrest and electronic monitoring. (ECF No. 86 at 4.) Beyond failing for the reasons this Court has already explained and those the government provides below, Chen's proposals face a practical problem. Take, for example, her traveling to California. Right now, she is exposed to one other inmate and the Jail staff who clean her cell and otherwise supervise her confinement. If she were to be released, she would need to go through the release process at the Delaware County Jail and travel from Delaware, Ohio, to her residence on the other side of the country. Whatever her manner of travel, she would likely encounter more

people if released than she would face if she remained in her segregated cell. In other words, Chen may face a greater risk of infection upon release than she currently does in the Delaware County Jail.

Regardless, even if Chen were to reside in the Southern District of Ohio, this Court has already explained that these kinds of conditions do not sufficiently temper the incurable risk of flight present in this case. In denying Zhou's motion for bond the Court explained that "in-home detention within this District . . . would still be insufficient to reduce the substantial risk of Zhou's flight." (ECF No. 58 at 13.) Just the same with Chen. Once out, it would simply take Chen fleeing to a diplomatic safe zone, including a Chinese consulate as close as Chicago or Washington, DC, and there would be no way to compel her return—at any point, ever. (*See* ECF No. 51 at 14.) At a time when Pretrial Services' resources are needed most, and at a time when those services are at their greatest risk of being exploited, any additional issues could prove the difference between proper monitoring and a defendant who will never be held to account here in the States. The risk is simply too great.

The Court also previously discussed how the Defendants' wherewithal and capabilities factor into the detention analysis, citing *United States v. Xiaorong You*, No. 2:19-CR-14, 2019 U.S. Dist. LEXIS 96776, at *16 (E.D. Tenn. June 10, 2019): "As aptly stated by the *You* court, '[t]he crimes charged required intelligence, planning, capital, facility in deception, international communications, and international motives. The crimes carry severe penalties. Defendant has the financial resources, international connections, and incentive to flee, rather than risk a lengthy prison sentence.'" (ECF No. 58 at 12–13.) None of that has changed. Based on the allegations in the Indictment, and the government's presentation at three different detention hearings, the Court's

citation to *You* rings just as true to Chen now as it did to Zhou then.  She is equally as culpable as Zhou, has extensive ties to China, faces the exact same penalties, and is every bit as intelligent and educated as Zhou.

The proposed conditions were not sufficient for Zhou, and they are not sufficient for Chen.

### III.  CONCLUSION

Nothing has changed since Judge Jolson found Yu Zhou and Li Chen to be flight risks, and since this Court re-affirmed that decision in November regarding Zhou.  Chen is in the exact same position as Zhou.  She has incentive and means to flee, and she has the connections and resources in China to continue her life there.  If she flees, she will not come back.  Speculative fears about COVID-19 do not change this reality, particularly not when the jail where she is held is taking extraordinary steps to prevent any issues with COVID-19 before they even happen.  For these reasons, the United States respectfully requests that the Court deny Chen's motion for release.

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney

s/ J. Michael Marous
J. MICHAEL MAROUS (OH 0015322)
PETER K. GLENN-APPLEGATE (OH 0088708)
S. COURTER SHIMEALL (OH 0090514)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, OH 43215
Phone No.: (614) 469-5715
Fax No.: (614) 469-5653
Email: mike.marous@usdoj.gov
Email: peter.glenn-applegate@usdoj.gov
Email: courter.shimeall@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum in Opposition to Defendant Li Chen's Motion to Revoke Detention Order submitted by the United States was served this 24th day of March, 2020, electronically upon all counsel of record.

s/ J. Michael Marous<br>
J. MICHAEL MAROUS (OH 0015322)<br>
Assistant United States Attorney