UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br>     **Plaintiff,**<br><br>     v.<br><br>**LI CHEN (2),**<br>     **Defendant.** | **CASE NO. 2:19-cr-163(2)**<br><br>**JUDGE SARAH D. MORRISON** |

### SENTENCING MEMORANDUM OF THE UNITED STATES

The United States submits its Sentencing Memorandum regarding Defendant Li Chen, whose sentencing is set for January 20, 2021, at 11:00 a.m. For the reasons below, the United States recommends that the Court impose the following sentence in this case: 52 months' incarceration, forfeiture according to the parties' Plea Agreement, supervised release of 3 years, and restitution of $2,616,087.

### I.   BACKGROUND

Yu Zhou and the Defendant, Li Chen, worked at Nationwide Children's Hospital (NCH or the Hospital) as researchers starting in 2007 and 2008, respectively. Over the course of several years before they departed from the Hospital, they executed a scheme to set up businesses in China, steal cutting-edge exosome research from NCH, and profit from doing so. On July 24, 2019, after a multi-year investigation led by FBI, a grand jury in this District returned an Indictment charging Zhou and Chen with various violations of the Economic Espionage Act, including one count of Conspiracy to Commit Theft of Trade Secrets, in violation of 18 U.S.C. § 1832(a)(5), and multiple counts of Theft of Trade Secrets—two for Zhou, three for Chen—in violation of 18 U.S.C. §§ 1832(a)(1)–(4). The Indictment also charged both Defendants with one count of Conspiracy to

Commit Wire Fraud, in violation of 18 U.S.C. § 1349, and one or both Defendants with 22 counts of Wire Fraud, in violation of 18 U.S.C. § 1343.

On July 30, 2020, Chen entered a plea of guilty to Count 1 of the Indictment, which charged her with Conspiracy to Commit Theft of Trade Secrets, and Count 5 of the Indictment, which charged her with Conspiracy to Commit Wire Fraud. The parties entered the plea agreement pursuant to Rule 11(c)(1)(C) of the Rules of Criminal Procedure, with an agreed-upon range of incarceration of between 24 and 84 months. (*See* ECF No. 95, ¶ 8(b)(i).) The parties also agreed to the following enhancements as part of the Agreed Sentencing Disposition:

- A 16-level increase because the loss amount, for Guidelines' purposes, is between $1.5 million and $3.5 million (U.S.S.G. § 2B1.1(b)(1)(I));
- A 2-level sophisticated-means enhancement (U.S.S.G. § 2B1.1(b)(10));
- A 4-level increase for benefitting a foreign government or instrumentality (U.S.S.G. § 2B1.1(b)(14)); and
- A 3-level increase abuse of a position of a trust (U.S.S.G. § 3B1.3)).

According to the Plea Agreement, the Defendant agreed to pay restitution as determined by the Court. (ECF No. 95, ¶ 8(g).) Also as part of the Plea Agreement, the Defendant agreed to forfeit the following: All rights to receive a $450,000 payment from GenExosome Technologies (GenExosome); 500,000 shares of Avalon GloboCare (Avalon) common stock; 400 shares of GenExosome common stock; and $1,445,908.97 in the form of a forfeiture money judgment.

This matter is set for sentencing on January 20, 2021.

    **II.**    **GUIDELINES RANGE/PRESENTENCE INVESTIGATION REPORT**

The Probation Officer issued a final Presentence Report (PSR) on December 4, 2020. According to the PSR, the total offense level (TOL) is 30. The PSR recommended the following enhancements in reaching a TOL of 30:

- Base offense level: 7 (U.S.S.G. § 2B1.1(a)(1));

2

- Loss enhancement: +18 (U.S.S.G. § 2B1.1(b)(1)(J));
- Substantial part of scheme outside of U.S.: +2 (U.S.S.G. § 2B1.1(b)(10)(B));
- Benefit of foreign government or instrumentality: +4 (U.S.S.G. § 2B1.1(b)(14)(B))
- Position of public or private trust: +2 (U.S.S.G. § 3B1.3); and
- Less 3 points for acceptance of responsibility (U.S.S.G. § 3E1.1(b)).

The PSR further calculated the Defendant's Criminal History (CH) Category as a I, with a resulting range of 97–121 months. (PSR, ¶ 118.) The Probation Officer did not identify any factors warranting departure from the guidelines range. (*Id.* ¶ 135.)

Counsel for Chen brings one objection to the PSR's calculations, specifically regarding the loss figure. At base, Chen contends that the loss value should fall between $1.5 and $3.5 million. On that front, the Government agrees. In reaching a loss value greater than $3.5 million, the PSR valued the 500,000 shares of Avalon stock at $4.55 per share. The PSR's chosen valuation is indeed based upon one feasible way for calculating the Avalon stock value, given that $4.55 is the value Avalon put on the stock at the time of the transaction. (PSR, ¶ 55; ECF No. 95, at PAGEID #: 870–71; *see also* Exhibit B to Defendant's Objection Letter, at PAGEID #: 1000–01.) Despite that, the Government views $2.78 as the more precise way to value the stock, since that was the closing value on November 5, 2018, the date the shares were first traded publicly. (*See* ECF No. 95, at PAGEID #: 871.) This is also a more objective measure of valuing the stock than the Defendant's choice of $1.00 per share, which is based in part on what Chen and Zhou listed on their 2017 tax return. Instead, taking the Avalon stock at the objective value of $2.78 per share nets an intended loss value of $2,716,087, and an actual loss value of $2,616,087 (because Chen and Zhou received $350,000 of the promised $450,000 that was part of their Stock Purchase Agreement with GenExosome). This value is also consistent with the parties' agreement on this front (*see id.* ¶ 8(b)(2)), which the Government intends to honor.

3

If the Court agrees with the parties on the loss value falling between $1.5 million and $3.5 million, it would result in a 16-level increase to the base offense level pursuant to U.S.S.G. § 2B1.1(b)(1)(I). Doing so would further result in a total adjusted offense level of 28 which, with a CH of I, would net an advisory Guidelines range of 78–97 months.

### III. ANALYSIS AND RECOMMENDATION OF THE UNITED STATES:

Sentencing requires a determination of the applicable guideline range, whether a departure is appropriate, and a consideration of the factors in 18 U.S.C. § 3553(a). *See Gall v. United States*, 552 U.S. 38, 49–50 (2007). This is a serious offense. The Defendant stole sensitive, cutting-edge research that NCH took years to develop and extensive measures to keep secret. In doing so, she willingly took part in the Chinese Government's long-term efforts to steal American intellectual property. And in doing so, she violated the Hospital's trust, used the Hospital's resources, and acted behind the Hospital's back, all to enrich herself and to the detriment of the Hospital's research interests and reputation. For these reasons, and those below, the Government submits that 52 months' incarceration, forfeiture according to the parties' Plea Agreement, supervised release of 3 years, and restitution of $2,616,087, amounts to a fair sentence.

A. **Nature and Circumstances, and Seriousness of the Offense**

  1. **Chen's conduct is part of a broader PRC effort at state-sponsored theft of foreign intellectual property.**

The conduct of Chen and her co-Defendant was not an accident, or a one-off instance of fraud. They were carrying out a very small part of the policy directives of the People's Republic of China (PRC). In 2019, the United States Senate Subcommittee on Homeland Security and Governmental Affairs released a report titled, "Threats to the U.S. Research Enterprise: China's

4

Talent Recruitment Plans."[1] The report details in part the PRC's broader set of intellectual property policies, which include the state-sponsored theft of foreign technology for the benefit of the PRC and its policy goals—the very set of state-sponsored incentives in which Chen participated and from which she profited, as described below.[2] Technological advancement, including in biotechnology and medical research, is state-directed, and accomplished in part by the acquisition of foreign technology through theft.[3] Consistent with this approach, in 2015 the State Council, the PRC's highest governing body, introduced its "Made in China 2025" plan, which is a state-led program to further technological and economic growth in China.[4]

As part of the plan, the PRC funds and directs what amounts to the illegal acquisition of foreign technology and intellectual property, in part through so-called talent plans. These plans seek to recruit, and then pay, individuals in America to bring intellectual property to China for the PRC's "own economic and military gain"[5] without regard to who owns it—thereby incentivizing

---

[1] *See* United States Senate Permanent Subcommittee on Investigations, Committee on Homeland Security and Governmental Affairs (Rob Portman and Tom Carper, Chairs), "Threats to the U.S. Research Enterprise: China's Talent Recruitment Plans," 2019, *available at* https://www.hsgac.senate.gov/imo/media/doc/2019-11-18%20PSI%20Staff%20Report%20-%20China's%20Talent%20Recruitment%20Plans.pdf (last visited Jan. 11, 2021).

[2] *See, e.g.*, *id.* at 1–2 ("China aims to be the world's leader in science and technology ("S&T") by 2050. To achieve its S&T goals, China has implemented a whole-of-government campaign to recruit talent and foreign experts from around the world. China's campaign is well financed. According to an analysis by the FBI, China has pledged to spend 15 percent of its gross domestic product on improving human resources from 2008 to 2020. That amounts to an investment of more than $2 trillion. For the Chinese government, international scientific collaboration is not about advancing science, it is to advance China's national security interests.").

[3] *See, e.g.*, *id.* at 7–10 ("Findings of Fact"); *see also id.* at 7 ("**3) China aggressively recruits overseas researchers and scientists.** China has a coordinated global campaign to recruit overseas S&T experts as part of its S&T strategy. These experts provide access to know-how, expertise, and foreign technology—all necessary for China's economic development and military modernization. Chinese recruitment efforts also have begun to reverse China's brain drain, as more Chinese students than before are returning to China after studying abroad.").

[4] *See, e.g.*, *id.* at 18 (describing the "Made in China 2025" plan, through which the PRC Government "targets ten strategic industries—including next-generation information technology, aviation, rail, new energy vehicles, and agricultural machinery—that are critical to China's economic competitiveness and high-tech growth").

[5] *Id.* at 1.

5

wholesale theft in many cases. The PRC Government employs more than 200 talent plans toward these ends.[6] These include national plans, like the Thousand Talents Plan, and regional talent plans tied to a given city, or a given province in China. Talent plans are just part of the whole-of-government approach employed by the PRC on this front. The PRC also incentivizes individual researchers to steal intellectual property abroad through other expert programs managed by the State Administration of Foreign Expert Affairs (SAFEA),[7] or through providing funding to these individuals through the National Natural Science Foundation of China (NSFC).[8]

The PRC is often indiscriminate about the provenance of the technology it seeks to re-patriate to China. In other words, the talent plans pay for any kind of work that anyone can offer, without regard to the ownership interests of the information and technology at issue. This is not standard state-sponsored espionage, where governments around the world engage in symmetric, government-to-government efforts to gather information in the interest of national security or diplomacy. The PRC approach is unique, in that it includes government-sponsored theft from foreign private enterprise to benefit not just the PRC Government, but also PRC-based businesses.

The PRC's efforts at stealing foreign intellectual property carry a heavy price for America. Based upon of the nature of America's economic system, American business and taxpayers fund the research and development associated with scientific and technological development. China's

---

[6] *Id.*

[7] According to SAFEA's website, it is responsible for, among other things, the employment of "foreign experts to work in the Chinese mainland," "[a]dministering relevant international exchanges and cooperation," and "[u]ndertaking other matters assigned by the PRC's State Council and the PRC's Ministry of Human Resources and Social Security."

[8] The NSFC promotes and finances scientific research in the People's Republic of China. The NSFC operates under the direction of the PRC's State Council and the PRC's Ministry of Science and Technology (MOST). The State Council is the highest governing authority under the Chinese Communist Party (CCP). MOST coordinates science and technology activities in China; one of MOST's goals is to formulate and implement strategies and policies for innovation-driven development, scientific and technological development, and the attraction of foreign talent.

efforts with respect to intellectual property mean that the PRC and its state-sponsored economy get to short circuit that process of development. In other words, American businesses and "American taxpayer funded research ha[ve] contributed to China's global rise" in science and technology "over the past 20 years."[9] This is why FBI Director Chris Wray recently described the "Chinese theft" of American intellectual property as "so massive that it represents one of the largest transfers of wealth in human history."[10] And it is why Director Wray went on to describe the PRC's theft of American ingenuity as "[t]he greatest long-term threat to our nation's information and intellectual property, . . . economic vitality, . . . economic security—and by extension, to our national security."[11] The net effect of all of this is that American research institutions and private companies "are effectively footing the bill for China's own technological development," which "China then leverages . . . to undercut U.S. research institutions and companies, blunting our nation's advancement and costing American jobs."[12]

The Defendants' alleged conduct bears the above markers of the PRC Government's efforts to illegally transfer intellectual property from American to China. Starting no later than 2015, the Defendants engaged in substantial contact with the PRC Government in relation to their positions at the Hospital. For example, Zhou became a member of the International Technology Transfer Network (ITTN), a professional organization located in China committed to promoting international technology transfer to China. Chen participated in the submission of grant

---

[9] "Threats to the U.S. Research Enterprise: China's Talent Recruitment Plans," *supra*, at 1.

[10] Chris Wray, Hudson Institute Remarks, July 7, 2020, "The Threat Posed by the Chinese Government and the Chinese Communist Party to the Economic and National Security of the United States," available at https://www.fbi.gov/news/speeches/the-threat-posed-by-the-chinese-government-and-the-chinese-communist-party-to-the-economic-and-national-security-of-the-united-states (last visited January 7, 2021).

[11] *Id.*

[12] *Id.*

applications regarding exosome research to the NSFC, a PRC Government entity. Some of those grants included NCH research and intellectual property for which she had not received approval to share. The Defendants also each served as foreign experts—for various PRC Government expert talent plans; including for the PRC Government's SAFEA. In addition, Chen and her co-Defendant applied to PRC Government talent plans, which, as explained above, the PRC Government uses to transfer foreign research and technology to the PRC. Through the Beijing Municipality Scholarship Foundation, overseen by the Beijing Overseas Scholars Center, Chen received a start-up grant for the Defendants' exosome business in China. The Defendants' work for these PRC institutions related to their work for the Hospital. Both Defendants in fact received payments from SAFEA on multiple occasions for technical direction and exchange, which is consistent with the PRC Government's efforts to steal foreign intellectual property.

2. **Chen exploited NCH's trust to steal sensitive information and enrich herself as part of an intentional, years-long fraud scheme.**

Chen worked with Dr. David Brigstock, a Principal Investigator at NCH, regarding cutting-edge exosome research pertaining to liver fibrosis, a pre-cancerous condition. During her ten years with NCH, she spent significant time learning from Dr. Brigstock. With his help and tutelage, she grew into his lead researcher, and one of his most trusted colleagues. He trusted her with cutting-edge grant proposals. He trusted her to work late in his lab by herself. He trusted her to supervise other employees. And he trusted her with his life's work, namely detailed research and development related to exosomes and the liver.

Chen exploited the depth of that trust in executing the scheme. Relevant to the Court's consideration, Chen's efforts weren't an accident, or limited to a few isolated incidents. They were part of a concerted effort, executed through repeated breaches of trust and protocol, to execute a

8

years-long theft scheme to steal sensitive Hospital trade secrets and property regarding research that was done in furtherance of the treatment of vulnerable children—including premature babies born with life-threatening conditions like necrotizing enterocolitis.

For example, Chen and Zhou were required by the Hospital's employment policies to report any outside work. They violated policy on numerous occasions:

- They did not disclose to the Hospital that they started an exosome company in China in 2015.
- They did not disclose to the Hospital that they started a parallel exosome company in America in 2017.
- They did not disclose to the Hospital that they sought and received multiple patents in China related to the research they were conducting at the Hospital.
- The Defendants did not disclose to the Hospital that they then monetized those patents, as well as the other intellectual property they stole from the Hospital, when they sought and received a substantial outside payment related to the Hospital's confidential information.
- The Defendants did not disclose to the Hospital that they organized an exosome conference in China in 2017.
- The Defendants did not disclose to the Hospital that they were routinely using Hospital resources to conduct unauthorized research.
- They did not disclose to the Hospital that they used Hospital research images in their outside company's marketing material.
- Chen did not disclose to the Hospital that she sent a letter purporting to invite another person to be a "visiting scholar" at the Hospital, even though she lacked authority to make such an invitation.
- They did not disclose to the Hospital that they were repeatedly sending Hospital trade secrets and property through email.
- They did not disclose to the Hospital that they were engaging in regular travel outside the state and country related to exosome conferences and business, and then presenting sensitive Hospital material at those conferences.
- And they did not disclose to the Hospital that they started an American company focused on the exact same research, information, and trade secrets that were the subject of the Hospital's trade secrets and research.

For Chen's part, the use of email and Hospital time and equipment was crucial to the scheme. After Zhou physically left the research lab, Chen continued to misappropriate the

9

Hospital's trade secrets and confidential information. For example, two days after Zhou executed the four agreements, Chen used a NanoSight instrument designed for the scientific analysis of nanoparticles—to which she had access only by virtue of her employment at the Hospital—to conduct unauthorized research. She went on to do so several more times before leaving the research lab. On multiple occasions, acting contrary to Hospital policy and without Hospital authorization or knowledge, she forwarded confidential files from her Nationwide Children's Hospital email account to Zhou's email account based in China. Finally, on January 31, 2018, Chen resigned from her position in the research lab at Nationwide Children's Hospital. Less than four months later, Zhou and Chen filed yet another patent application in China regarding exosomes.

     Chen, of course, knew what she was doing. She and Zhou signed documentation from the Hospital noting their awareness of the policies they would subsequently violate. And she exchanged an email with Zhou that had the pertinent policy information attached—all indicating that the Hospital owned intellectual property developed with Hospital resources or by Hospital employees. But even without those steps, she knew what she was doing. As the Government expects the Court to hear at sentencing through victim statements, there should be no doubt that every one of Chen's improper actions would've sent alarm bells off in any other similarly situated employee's mind. She knew that the Doctors who ran the labs at NCH would've wanted to know about what they were doing in China. She knew they wouldn't approve of her using NCH equipment for an outside company. She knew that the Doctors wouldn't approve of sending sensitive NCH research over email to China. She knew that the Doctors wouldn't approve of their work being used as the basis for PRC patents. She knew that the Doctors wouldn't want to see

their work turning up in unauthorized grants to the Chinese Government. She knew, in other words, that she was wrong, which is why she tried to hide what she was doing for years.

The Defendant's conduct was brazen, it was repeated over years, and it was devastating to the people at NCH who trusted her the most. The Government submits that a sentence of 52 months' incarceration would adequately account for the nature and circumstances of the offense, and the seriousness of the Defendant's conduct.

### B. Deterrence

Section 3553(a)(2)(B) requires consideration of "the need for the sentence imposed" to "afford adequate deterrence to criminal conduct." Deterrence includes both specific deterrence (of a particular defendant) and general deterrence (of a broader audience of potential defendants). The Government submits that this case has a particularly high value when it comes to general deterrence. As the Government has laid out in this memorandum, and as news outlets and public reports have documented at length over the last few years, the PRC's efforts to steal American intellectual property are extensive. They pose a threat to America's long-term national security. And they hurt American businesses and research institutions. They will continue to do so unless steps are taken to dissuade this type of conduct.

One step that can be taken is to deter others situated similarly to Chen. Deterrence with respect to the PRC Government is not within the scope of this prosecution. But there is a group that is quite likely to be deterred by sentences like the one the Court will levy in this case: individual researchers who have been similarly incentivized through PRC Government programs to steal trade secrets created and owned by Americans. The PRC's efforts are constant, and the PRC Government has, undoubtedly, reached out to a significant number of individuals in America

right now to provide the same incentives they provided to the Defendant, some of whom might well be poised to carry out the same type of conduct as the Defendants in this case. A sentence that properly accounts for the Defendants' conduct is likely to resonate with others who might be inclined to do something similar to the conduct in this case.

The deterrence value of the sentence in this case is made all the more likely by the nature of the conduct at issue. The Defendants stole sensitive research information from one of the top Children's Hospitals in the country. Other individuals working in a similar fashion with the PRC, or on their own, to steal research information—whether at another Children's Hospital, or another American company—are likely to see the result of this case. And with a sentence that properly accounts for Chen's conduct, there is a strong likelihood that they will be dissuaded from carrying out additional harm, or from getting started in the first place. In order to deter others, and to prevent future harm, the Government submits that a sentence of 52 months will achieve these ends.

### C. Unwarranted Sentencing Disparities

Given the scope of the problem at issue, there has been an uptick over the last several years in prosecutions regarding the theft of American intellectual property. The sentences levied in those cases have started to become more substantial, depending on the circumstances, given that the theft of sensitive intellectual property—even if seemingly limited to a single company—has an aggregate effect on long-term national security and the stability of American commerce. *See, e.g.*, *United States v. German*, No. 4:19-cr-00069 (S.D. Ga. Feb. 13, 2020) (70 months' imprisonment for conspiring to steal design information from aircraft companies); *United States v. Dokuchaev*, No. 3:17-cr-00103 (N.D. Cal. May 29, 2018) (one defendant sentenced to a total of 60 months' incarceration for efforts to aid Russian attempts to hack Yahoo!); *United States v. Xu*, No. 7:16-


cr-00010 (S.D.N.Y. Jan. 18, 2018) (60 months' imprisonment for stealing proprietary source code from U.S.-based employer); *United States v. Justice*, No. 2:16-cr-00499 (C.D. Cal September 18, 2017) (60 months' incarceration for theft and attempted sale of military-related information by a satellite engineer); *United States v. Long*, No. 3:16-cr-00229 (D. Conn. June 22, 2017) (sentenced to time served, which amounted to approximately 2.5 years' incarceration, for stealing military research from an American company and attempting to take the information to China); *United States v. Shi*, No. 1:17-cr-00110 (D.D.C.) (sentence of 16 months' incarceration for stealing drilling-related intellectual property, which the Court found at sentencing to have been done for the benefit of the PRC); *United States v. Zhang*, No. 5:15-cr-00106 (N.D. Cal.) (18 months' incarceration regarding for stealing trade secrets from semiconductor companies); *United States v. Huang*, No. 1:10-cr-00102 (S.D. Ind. Jan. 5, 2012) (87 months' sentence for stealing sensitive information from Dow AgroSciences LLC with the intent to benefit components of the PRC).

The Government submits that a sentence of 52 months fits with the trendline of the sentences levied in those cases, properly accounts for the severity of the offense, and would avoid unwarranted sentencing disparities.

### D. Restitution

Section 3553(a)(2)(B) requires consideration of "the need to provide restitution to any victims of the offense." The Mandatory Victim Restitution Act requires the Court in circumstances like these to order restitution in an amount equal to the value of the lost property. 18 U.S.C. § 3663A(b)(1)(B). In this case, the Hospital's loss was total—that is, after Chen's and her codefendant's criminal acts, the Hospital was no longer able to employ the exosome-isolation method that comprises Trade Secret 1.

The best measure of the value of the intellectual property the Hospital lost is what Avalon later paid Chen and Zhou for it. When the defendants sold all exosome-related intellectual property purportedly owned by them to Avalon, they received in exchange a total of $1,226,087 in U.S. Currency, 500,000 shares of Avalon common stock, and 400 shares of GenExosome common stock. As described above, the Parties dispute how to calculate the Avalon stock value. The United States believes it should be valued at $2.78 per share, because that was the value on the date the shares were first traded publicly. (*See* ECF No. 95, at PAGEID #: 871.) Without any precise way to value the shares when Avalon remained a private company, the earliest public value is the most reasonable way to calculate the share value. The Government sees this as a more appropriate valuation than Chen's proposal, which values the stock at $1.00 per share, in part because that is what she and Zhou listed on their 2017 tax return.

Adding $1,226,087 in cash to 500,000 shares multiplied by $2.78 per share comes to $2,616,087. The Court should order that amount in restitution to the Hospital. In the Plea Agreement, the United States has promised to support restoration, which would apply forfeited funds toward satisfaction of the restitution order. (*See* ECF No. 95, ¶ 9.)

Avalon has submitted a letter seeking a determination that it is also a victim of Chen and Zhou's crimes. Under the MVRA, a victim is a "person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern." 18 U.S.C. § 3663A. Here, the victim of Chen and Zhou's crimes was the Hospital. The very first page of the Indictment identifies the Hospital as "The Victim." (*See* ECF

14

No. 6, at PAGEID #: 34.) The Indictment describes theft of "valuable scientific trade secrets and other valuable property" from "Nationwide Children's Hospital." (*Id.* at 35.) The lead count is Conspiracy to Commit Theft of Trade Secrets, and the defendants stole the trade secrets from the Hospital, not Avalon. (*See id.* at 39–40.) The same is true for the Wire Fraud Conspiracy count, which also alleges loss to the Hospital, not Avalon. (*Id.* at 55–56.) Avalon may (or may not) be able to recover from Chen and Zhou in a civil suit, but this criminal case is not the proper vehicle for compensating Avalon.

## IV. CONCLUSION

For these reasons, a sentence of 52 months' incarceration, forfeiture according to the parties' Plea Agreement, supervised release of 3 years, and restitution of $2,616,087 would be sufficient but not greater than necessary to further the ends of sentencing.

Respectfully submitted,

DAVID M. DEVILLERS
United States Attorney

s/ J. Michael Marous
J. MICHAEL MAROUS (OH 0015322)
Special Assistant United States Attorney
S. COURTER SHIMEALL (OH 0090514)
PETER K. GLENN-APPLEGATE (OH 0088708)
Assistant United States Attorneys
303 Marconi Boulevard, Suite 200
Columbus, OH 43215
Phone No.: (614) 469-5715
Fax No.: (614) 469-5653
Email: mike.marous@usdoj.gov
Email: courter.shimeall@usdoj.gov
Email: peter.glenn-applegate@usdoj.gov

15

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Sentencing Memorandum of the United States was served this 13th day of January, 2021, electronically upon all counsel of record for Defendant Li Chen.

s/ J. Michael Marous
J. MICHAEL MAROUS (OH 0015322)
Special Assistant United States Attorney